## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                   Crim. No. 13-184 (DSD/JJK)

        Plaintiff,

v.                                              **REPORT AND RECOMMENDATION**

Alpha Rashidi Mshihiri,

        Defendant.

Lola Velazquez-Aguilu, Esq., Assistant United States Attorney, counsel for Plaintiff.

Rick E. Mattox, Esq., Mattox Law Office, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

### INTRODUCTION

This matter is before this Court for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1 on Defendant Alpha Rashidi Mshihiri's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 28), and his Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 29).  In the motion to suppress statements, Mshihiri seeks an order excluding any evidence of statements he made to federal law enforcement agents on September 16, 2010, at the Minneapolis-St. Paul International Airport.  He claims that introduction of those statements would violate his Fifth Amendment rights because they were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966),

or, alternatively, because he did not make any such statements voluntarily.  (Doc. No. 53, Def.'s Mem. in Supp. of Mots. to Suppress a Statement and Evidence Obtained by Searches and Seizures ("Def.'s Mem.") 1–6.)  In his motion to suppress physical evidence, Mshihiri seeks an order excluding evidence seized pursuant to a search warrant for his residence in Independence, Minnesota, and another for his laptop computer and any storage devices he possessed.  (Doc. No. 50, Ex. List, Gov't's Exs. 1 ("Independence Warrant") & 2 ("Laptop Warrant").)  He asserts that introduction of this evidence would violate his Fourth Amendment rights because the search warrants were issued without adequate probable cause.  (Def.'s Mem. 6–8.)

On November 25, 2013, the Court held a hearing on these motions.  At the hearing, United States Secret Service Agent Michael Olson testified for the Government concerning Mshihiri's September 16, 2010 statements to federal law enforcement officials.  Mshihiri also testified at the hearing in support of his motion to suppress statements.  The parties stipulated to the introduction of the Independence Warrant and the Laptop Warrant, which the Court received into evidence.  (Doc. No. 50.)  Based on the testimony and other evidence received at the hearing, Mshihiri's memorandum in support of his motions, and the Government's memorandum in opposition, this Court recommends that the motions be denied.

**DISCUSSION**

**I.    MOTION TO SUPPRESS STATEMENTS**

**A.    Facts**

United States Secret Service Agent Michael Olson and other investigators identified Mshihiri and companies Mshihiri owns as part of a large investigation of mortgage fraud and identity theft in the Minneapolis and St. Paul metropolitan area.  (Doc. No. 59, Nov. 25, 2013 Hr'g Tr. ("Tr.") 12:10–24.)  As part of the investigation, Internal Revenue Service Special Agent Jim Shoup and Agent Olson learned that Mshihiri would be returning to the United States from overseas on September 16, 2010.  (Tr. 13:4–19, 14:14–16.)  Special Agent Shoup obtained a search warrant to search Mshihiri, his laptop, and any media storage devices in his possession.[1]  (Laptop Warrant.)  At the time of the hearing, Agent Olson believed it was possible that Mshihiri's flight into the Minneapolis and St. Paul airport originated in Tanzania, but could not recall this fact with certainty.  (Tr. 33:3–12.)  Mshihiri testified that his flight into the United States came from Amsterdam, but that his trip originated in Tanzania, an eighteen-hour flight.  (Tr. 47:24–48:8.)

On September 16, 2010, Agent Olson and Special Agent Shoup went to the Minneapolis-St. Paul International Airport to execute the search warrant and to speak with Mshihiri about their investigation.  (Tr. 14:3–6.)  When they arrived

---

[1]    This is the Laptop Warrant that is one of the warrants at issues in Mshihiri's motion to suppress evidence seized as a result of search and seizure.

at the airport, Agent Olson and Special Agent Shoup contacted a United States Customs and Border Patrol supervisor working at the airport and coordinated the agents' entry into the international flight area. (Tr. 15:5–19 (discussing making contact with Customs first and then meeting Customs officials upon arriving at the airport).) The agents showed Customs officials a photo of Mshihiri and arranged to meet with Mshihiri after the Customs officials had concluded their own procedures with him, which they did. (Tr. 15:24–16:9, 16:23–17:9.)

According to Agent Olson, once Customs had finished with Mshihiri, the agents met Mshihiri in a "lounge area" close to the location in the airport where international passengers pick up their baggage. (Tr. 17:13–18:1.) Mshihiri was not restrained in any way when they encountered him. (Tr. 18:2–4.) Agent Olson described Mshihiri's demeanor as "calm," and that he was "wondering who [the agents] were." (Tr. 18:12–15.) Agent Olson testified that the agents and Mshihiri then went to an interview room directly adjacent to the "lounge area." (Tr. 18:7–11.) Mshihiri testified, however, that he was waiting in an interview room when he first encountered Agent Olson and Special Agent Shoup. (Tr. 49:20–50:9.)

Agent Olson testified that when they entered the interview room, he and Special Agent Shoup introduced themselves, explained that they were federal agents, told Mshihiri that he was the target of an investigation, that he was not under arrest, and that he did not have to talk to them if he did not want to. (Tr. 19:4–19.) Agent Olson testified that Mshihiri agreed to talk with the agents

4

and that the tone and volume of this conversation was normal.  (Tr. 19:18–19, 20:10–14.)

Agent Olson and Special Agent Shoup did not wear a law enforcement uniform when they went to the airport, but instead both wore "casual clothes." (Tr. 14:7–18.)  Agent Olson was certain that he was armed that day.  He couldn't remember whether he had "checked" his weapon, but was certain that at the time he interviewed Mshihiri later that day, if he still had his weapon it would have been concealed under a coat or a shirt.  (Tr. 14:19–15:4.)

When they entered the interview room, Agent Olson testified that he and Special Agent Shoup went into the room first.  The agents sat down furthest from the door and Mshihiri sat closest to the door.  (Tr. 18:20–19:1.)  Agent Olson testified that Mshihiri never asked to speak to anyone during the course of the interview.  (Tr. 23:11–13.)  But Mshihiri testified that when the interview began, he asked the agents if he could speak to his wife, the agents told him that he could not, and they then took his cellular phone away from him.  (Tr. 50:10–51:2.) Mshihiri further testified that he told the agents that his wife was waiting for him, so he wanted her to know that he was going to be delayed and that he wanted to get in touch with his wife so that she could contact his lawyer.  (Tr. 50:17–20, 51:9–11.)   Agent Olson recalled that Mshihiri's wife was also a part of the fraud investigation, and he testified that the topic of the possibility she would be prosecuted was part of Special Agent Shoup's questioning during the interview. (Tr. 35:6–23.)

Mshihiri also testified that during the interview Special Agent Shoup told him "you and your wife are going down.  You need to make arrangements for your children."  (Tr. 52:10–13.)  Agent Olson, on the other hand, did not recall anyone telling Mshihiri that he or his wife were "going down" or that Mshihiri should start wondering about where his children were going to go.  (Tr. 35:24– 36:5, 36:15–17, 39:21–40:4.)

Mshihiri testified that throughout the interview, at different occasions, a Customs official was present in the interview room.  He testified that at the beginning of the interview, a Customs official was still in the room and took away his phone.  (Tr. 50:1–51:2.)  He further testified that after Special Agent Shoup told him he and his wife were going down and needed to make arrangements for their children that the immigration officer was still at the door and said to him: "You need to cooperate; otherwise, your Immigration status is going to be compromised."  (Tr. 52:14–20.)  Mshihiri's stated that this occurred near the beginning of the interview.  (Tr. 52:21–24 ("[the agents] proceeded with asking questions" after the immigration official made this comment); Tr. 60:9–21 (explaining that this statement occurred at the beginning of the interview).)  When pressed by the Government's counsel for details about the Customs official's presence during the interview, Mshihiri said that he would come back to the room "frequently," which he explained was more than once but probably less than five times, that he would stand in the doorway, and that he would then leave and close the door.  (Tr. 58:14–60:5.)  Agent Olson stated that he did not recall

6

whether a Customs official was or was not looking into the interview room every so often to see how things were going.  (Tr. 37:14–17.)

Agent Olson testified that Special Agent Shoup asked Mshihiri several questions in the interview room about the investigation into the suspected mortgage fraud.  (Tr. 21:12–20.)  Agent Olson described Mshihiri's demeanor as calm throughout the process.  (*Id.*)  Agent Olson testified that Mshihiri asked a few questions in response or for clarification during this questioning.  (Tr. 21:21–22:6.)  The interview lasted about forty minutes, but it ended when Special Agent Shoup became frustrated, believing that Mshihiri was not providing him with truthful answers.  (Tr. 22:7–23:5.)

Agent Olson testified that at the end of the interview, he and Special Agent Shoup presented Mshihiri with a copy of the Laptop Warrant and advised him that there was a target letter for him from the United States Attorney's Office.  (Tr. 22:16–23:16.)  Agent Olson further testified that though he could not recall specifically the sequence of events, he and Special Agent Shoup may have executed the Laptop Warrant prior to interviewing Mshihiri, but did not search Mshihiri's person until the interview had concluded.  (Tr. 38:6–39:20.)

According to Agent Olson, Mshihiri never made any efforts to stop the questioning during the forty-minute interview, he never asked to take a break, to speak with anyone else, or to consult with a lawyer.  (Tr. 23:6–13, 40:11–20.)  Agent Olson also testified that Mshihiri never attempted to access his phone while they conducted the interview.  (Tr. 40:21–24.)  Neither Agent Olson nor

7

Special Agent Shoup ever placed Mshihiri under arrest, and Agent Olson testified that the agents never threatened Mshihiri's immigration status.  (Tr. 24:2–8.)  The agents did not make an audio recording of the interview.  (Tr. 32:10–11.)  When the interview concluded, Mshihiri was released and the agents left the airport. (Tr. 23:16–23.)

Agent Olson did not prepare a report following the meeting, but Special Agent Shoup did prepare a report three days after the interview.  (Doc. No. 50, Ex. List, Def's Ex. 1 ("Mem. of Interview").)   Agent Olson reviewed Special Agent Shoup's report before testifying at the hearing, but did not review any of his own notes or Agent Shoup's notes prior to the hearing.  (Tr. 27:15–28:1, 28:10–12.)

### B.   Analysis

#### 1.   *Miranda*

Mshihiri contends that his September 16, 2010 statements cannot be admitted against him because they were taken in violation of his Fifth Amendment right not to be compelled to be a witness against himself in a criminal case.  In particular, Mshihiri argues that his statements cannot be admitted against him on grounds that he was not provided the warnings of his rights required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and that he continued to be questioned despite having asked to speak to an attorney.  (Def.'s Mem. 2, 3–4.)  The parties dispute whether Mshihiri was in custody at the time of the interview, which determines whether *Miranda* warnings were required. (Def.'s Mem. 6 (citing *United States v. Aldrdge*, 664 F.3d 705 (8th Cir. 2011));

Doc. No. 57, Gov't Mem. in Opp'n to Def.'s Mots. to Suppress Statement and Evidence Obtained by Search and Seizures ("Gov't's' Mem.") 11–22.)  And the parties support their arguments concerning whether *Miranda* warnings were required with competing interpretations on the credibility of Agent Olson's and Mshihiri's testimony.  (Def.'s Mem. 4–5; Gov't Mem. 9–11.)

When a defendant alleges that evidence was obtained in violation of the Constitution, the Government bears the burden to prove its admissibility by a preponderance of the evidence.  *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (holding that when a defendant seeks to exclude a confession that he contends was involuntary, "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary").  Testimony that is not credible may be discredited and not used as support for the Government's burden.  *See United States v. Foster*, 752 F. Supp. 2d 1060, 1063, 1067 (D. Minn. 2010).

### 2.    Custody

Government agents must provide a *Miranda* warning prior to a custodial interrogation, and failure to provide such warnings renders inadmissible any

statements obtained during that custodial interrogation.[2]  *Miranda v. Arizona*, 384

U.S. 436, 444 (1966).  A custodial interrogation is one that "involves questioning

initiated by law enforcement officers after a person has been taken into custody

or otherwise deprived of his freedom of action in any significant way."  *Miranda*,

384 U.S. at 444.

The resolution of Mshihiri's motion to suppress statements turns on the

issue of custody, which itself depends on the credibility of the witnesses who

testified at the motions hearing.  The "determination of custody depends on the

objective circumstances of the interrogation, not on the subjective views

harbored by either the interrogating officers or the person being questioned."

*Stansbury v. California*, 511 U.S. 318, 323 (1994).  Although not an exhaustive

list, in determining whether a defendant was in custody at the time of

questioning, this Court considers such factors as:

> (1) whether the suspect was informed at the time of questioning that
> the questioning was voluntary, that the suspect was free to leave or
> request the officers to do so, or that the suspect was not considered
> under arrest; (2) whether the suspect possessed unrestrained
> freedom of movement during questioning; (3) whether the suspect

---

[2]    To trigger the protections of *Miranda*, an individual must also be subjected
to "interrogation."  Interrogation refers to "questioning initiated by law
enforcement officers."  *Miranda*, 384 U.S. at 444.  And it is defined as "express
questioning or its functional equivalent," which includes "words or action on the
part of the police (other than those normally attendant to arrest and custody) that
the police should know are reasonably likely to elicit an incriminating response
from the suspect[.]"  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  There is
no dispute here that Mshihiri was "interrogated" when Agent Olson and Special
Agent Shoup engaged in "express questioning" during the September 16, 2010
interview.

initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see also United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004) (indicating that the *Griffin* factors serve as a guide in resolving the question "whether the defendant was restrained as though he were under formal arrest").  The Court must assess the totality of the circumstances to decide whether a defendant was in custody at the time of the questioning.  *Czichray*, 378 F.3d at 826 ("In making th[e custody] evaluation, we consider the totality of the circumstances that confronted the defendant at the time of questioning.").

Mshihiri argues that the Government has not carried its burden to establish the admissibility of the statements Mshihiri made during the September 16, 2010 interview.  He contends that Agent Olson's testimony elicited by the Government was insufficient to show, by a preponderance of the evidence, that Mshihiri's statements are admissible because Agent Olson's testimony was not credible.  Specifically, he asserts that the Court should discredit Agent Olson's testimony because Agent Olson frequently had no detailed recollection about the events that occurred during the interview.  Conversely, Mshihiri argues that his own testimony was credible and establishes that Mshihiri was in custody during the September 16, 2010 interview, that he was not provided adequate *Miranda*

11

warnings, and that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.  (Def.'s Mem. 1–6.)

The Government, however, asserts that the evidence presented at the hearing shows that Mshihiri's statements from the September 16, 2010 interview are admissible.  It contends that Agent Olson's testimony was credible.  The Government argues that Agent Olson's testimony established that a reasonable person in Mshihiri's position would have felt free to end the interview, and was not, therefore, in custody.  Further, the Government contends that Mshihiri's own testimony was unbelievable.  In addition to pointing out Mshihiri's interest in testifying in a manner that will help his position on the motion, the Government argues that Mshihiri has shifted his version of the events that transpired from his original motion papers to the testimony he provided on direct examination, and did so to make the circumstances seem more coercive than they were in reality. Ultimately, the Government argues that Agent Olson and Special Agent Shoup were not required to provide Mshihiri with *Miranda* warnings because Mshihiri was never in custody.  (Gov't Mem. 9–22.)

Assessing the totality of the circumstances, this Court concludes that Mshihiri was not in custody and no *Miranda* warnings were required, and as a result, admitting his statements from the September 16, 2010 interview will not

violate Mshihiri's Fifth Amendment rights.[3]   In reaching this conclusion, this Court

credits several relevant aspects of Agent Olson's testimony.   This Court credits

Agent Olson's testimony that, prior to the interview taking place, he and Special

Agent Shoup informed Mshihiri that he was not under arrest and that he did not

have to answer any questions.   The report Special Agent Shoup prepared three

days after the interview took place corroborates these details (Def.'s Ex. 1, Mem.

of Interview 1), and Special Agent Shoup created the report close enough in time

to the interview that this Court is convinced it accurately conveys these details at

the beginning of the interview.   In addition, this Court credits Agent Olson's

---

[3]      In his brief, Mshihiri asserts that he "had a Sixth Amendment right to
counsel at the time of the interview" as a basis for suppressing his statements.
(Def.'s Mem. 3.)   However, the Sixth Amendment right to counsel only adheres
during critical stages of criminal proceedings against the defendant.   *United
States v. Lewis*, 483 F.3d 871, 873–74 (8th Cir. 2007).   These include post-
indictment lineups, arraignment, and plea hearings, but do not include the taking
of handwriting exemplars, fingerprints, a blood sample, clothing, hair, and the
like.   *Id.* at 874.   Here, there is no evidence that criminal judicial proceedings had
begun against Mshihiri.   He was not indicted in this case until July 16, 2013.
(Doc. No. 1.)   The fact that Mshihiri was presented with a target letter does not
change this fact because a target letter does not mark the initiation of formal
charges.   *Cf. United States v. Ingle*, 157 FF.3d 1147, 1151 (1998) ("[N]either
custodial interrogation nor a grand jury appearance triggers the Sixth
Amendment right to counsel *absent the initiation of formal charges*, even if the
target of those investigative actions is represented by counsel.") (emphasis
added).   To the extent that Mshihiri is arguing that the existence of an attorney-
client relationship with his lawyer at the time of the September 16, 2010 interview
creates a Sixth Amendment right to counsel, this Court notes that the Supreme
Court and the Eighth Circuit Court of Appeals have rejected this argument.
*Moran v. Burbine*, 475 U.S. 412, 430 (1986); *United States v. Ingle*, 157 FF.3d
1147, 1151 (1998) ("The existence of a suspect's attorney-client relationship
does not, by itself, trigger the Sixth Amendment right to counsel.").   Accordingly,
this Court concludes that his Sixth Amendment right to counsel was not violated
in any way during the September 16, 2010 interview.

testimony that Mshihiri was not physically restrained during the interview.
Mshihiri did not dispute this fact.  Further, the agents did not sit between Mshihiri
and the door, which is another undisputed fact relevant to the custody inquiry.
And the Court credits Agent Olson's testimony that Mshihiri never asked to end
the questioning.  Mshihiri, however, did dispute this fact (Tr. 64:5–8), but as
explained below, this Court concludes that is more likely that Mshihiri did not
make a clear request to end the interview.

Mshihiri's arguments regarding Agent Olson's credibility rest on the fact
that Agent Olson qualified many of his answers by referring to his "recollection" of
the interview's circumstances.  For example, when asked whether Mshihiri asked
to speak with his wife, Agent Olson testified "I don't recall."  (Tr. 34:5–6.)
Similarly, when defense counsel asked "[w]ho told [Mshihiri] that he should start
thinking about where his children would go?" Agent Olson testified "I don't recall
that."  (Tr. 36:15–17.)  And, discussing his testimony generally, Agent Olson also
testified that when he used the phrase "not to my recollection" during his
testimony, he meant that he just did not have any memory whether something
may have happened or may not have happened.  (Tr. 45:18–24.)  This Court
finds that by qualifying his testimony at the hearing as being made to the best of
his recollection and indicating when he could not recall specific details of the
September 16, 2010 interview, Agent Olson did not render his testimony as a
whole not credible.  Agent Olson's memory of the interview, which had taken
place more than three years before he testified at the November 25, 2013

hearing, may not have permitted perfect recall of all the details of that encounter. But he also testified credibly that certain events Mshihiri suggests made the interview coercive did not occur, or, if they did occur, happened at the end of the interview so that Mshihiri was not coerced into participating in the interview. Agent Olson testified that he did not recall one way or another whether Special Agent Shoup made any statements concerning Mshihiri's children, but did say that if the topic came up, it happened at the end of the interview when Special Agent Shoup became frustrated with Mshihiri's answers, and this was nearly forty minutes after Mshihiri agreed to speak with the agents. (Tr. 41:10–16.)  Agent Olson also testified without qualification that Mshihiri did not ask to speak to a lawyer. (Tr. 40:11–20.)  And Agent Olson testified that Mshihiri never refused to talk with the agents. (Tr. 35:2–5.)  Overall, Agent Olson provided consistent, believable testimony concerning those aspects of the interview most relevant to the question of custody.

On the other hand, Mshihiri's testimony about details he claims made the interview coercive was not so consistent or believable.  His testimony that he asked for permission to contact his lawyer at the outset of the interview provides an important example.  When describing the beginning of the interview, Mshihiri initially testified that he asked the agents if he could speak to his wife because he was concerned that she was waiting for him outside and would worry about how long it was taking him to meet up with her.  He did not mention anything about asking to contact a lawyer.  Specifically, he testified as follows:

15

Q:      Did they [Agent Olson and Special Agent Shoup] tell you why
        . . . you were there talking to them?

A:      They didn't tell me directly.  They just started — they
        mentioned that they have a warrant — I mean a search
        warrant.  And when they  — they offered to ask my — some
        questions.  And the Agent — well the other Immigration officer
        as still in the room.  And my first statement was — it was, like,
        ***"What is this all about?  And how long is it going to take?
        Because I have to inform my wife.  She's outside waiting
        for me.  She will be worried.  She need to know what is —
        why am I late."***  Because normally it doesn't take me long.
        And they told me, "No you cannot talk to your wife about this."
        And, actually, at that time, that's when they took my phone
        away from me.

(Tr. 50:10–23 (emphasis added).)  Then, when Mshihiri's counsel asked him "Did

you have any intent to call your wife and ask her to do something for you?"

Mshihiri added that his intent was to "Call so that we can inform my lawyer on

what was going on."  (Tr. 51:3–8.)  When he first added this detail of his

subjective intent, he did not indicate that he mentioned this intent to the agents

interviewing him.  But he added that detail shortly thereafter when he explained

that he "clearly asked" Agent Olson and Special Agent Shoup "can I talk at least

[to] a lawyer[?]"  (Tr. 51:10–11.)  The shifting nature of this portion of Mshihiri's

testimony—it began as a request to speak to his wife to make sure she was not

worried, turned into an unexpressed intent to have her reach out to his counsel,

and then morphed again into a clear request for permission to speak to a

lawyer—detracts from its credibility.

        Similarly, Mshihiri's statement that, at the beginning of the interview, he

was "very clear to . . . give [the agents] the reason why I will not answer those

16

questions" (Tr. 64:5–8; *see also* Tr. 70:17–71:8), is inconsistent with other testimony he provided on the subject of his alleged refusal to answer questions. Mshihiri testified several times, during both direct and cross examination, that when Agent Olson and Special Agent Shoup began asking him questions he initially responded by attempting to elicit information about what they were investigating.  (*See, e.g.*, Tr. 66:18–67:7.)  This version of events was consistent with Agent Olson's testimony describing Mshihiri's demeanor at the outset of the interview as "inquisitive."  Based on the evidence adduced at the hearing, it is more likely than not that Mshihiri never asked to end the interview.

Having made the foregoing credibility determinations, this Court makes the following proposed findings of fact.  Mshihiri was not restrained during the interview.  He sat closest to the door in an interview room with Agent Olson and Special Agent Shoup seated across the table from him.  He was advised that he did not have to answer the agents' questions.  He was told that he was not under arrest.  Mshihiri then agreed to answer the agents' questions.  It is more likely than not that Mshihiri did not clearly request permission to speak with an attorney.  It is also more likely than not that Mshihiri did not ask to end the interview or refuse to answer questions.  Based on these proposed findings of fact, and considering the totality of the circumstances, it is more likely than not that the interview did not involve an inherently coercive atmosphere akin to formal arrest.  As a result, Mshihiri was not in custody at the time of the

September 16, 2010 interview, and admitting the statements he made during that interview at trial will not violate his Fifth Amendment rights.

### 3.   Voluntariness

Mshihiri also contends that admitting his September 16, 2010 statements against him would violate his Fifth Amendment rights because his will was overborne by intimidating and coercive police conduct.  (Def.'s Mem. 4.) Mshihiri contends that his statements were involuntary because Special Agent Shoup told him that he and his wife were "going down," indicating that they would be charged criminally and eventually convicted.  He further asserts that his statements were coerced by threats because the agents told him that he needed to make arrangements for his children, and an immigration officer present in the interview room told him that he needed to cooperate or else he would jeopardize his immigration status.  He points out that he was fatigued after a lengthy international flight.  And Mshihiri asserts that he asked to speak to his wife to contact a lawyer, but was refused, that he had his cell phone taken away to prevent him from contacting a lawyer, and that when he asked to end the questioning, the agents persisted questioning him despite those requests.

"The test for determining the voluntariness of a confession is whether the police extracted the confession by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (internal quotations omitted).  This is a "very demanding

standard." *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004). Courts examine the totality of the circumstances in making this assessment. *Id.* In assessing the totality of the circumstances, the court must look not only to the conduct of the law enforcement officers, but also the defendant's ability to resist police pressure. *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998). As with the issue of custody discussed above, "the government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *LeBrun*, 363 F.3d at 724.

The version of events that transpired during the September 16, 2010 interview that Mshihiri relies on to make his voluntariness argument is not supported by credible evidence. As noted above, Mshihiri did not testify credibly that he clearly requested a lawyer. Nor does the Court find credible his testimony that he asked to end the questioning. In addition, it is more likely than not that any statement about Mshihiri's children or that he and his wife were "going down" occurred toward the end of the interview when Special Agent Shoup became frustrated with Mshihiri's level of cooperation. But this was after Mshihiri had already agreed to participate in the interview, and thus could not have compelled him to participate. Mshihiri's assertion that he was fatigued during the interview, although relevant to the totality of the circumstances, does not change this Court's conclusion that he participated voluntarily in the interview. *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) ("Sleeplessness, alcohol use and drug use are relevant to our analysis, but

19

intoxication and fatigue do not automatically render a confession involuntary.")
(internal quotations and alterations omitted).  The evidence at the hearing did not
sufficiently indicate that Mshihiri's fatigue following an eighteen hour flight caused
his will to be overborne.  For these reasons, the agents' conduct during the
interview was not calculated to overbear Mshihiri's will or to impair his capacity
for self-determination.  Moreover, Mshihiri is quite clearly an individual of, at the
very least, average intelligence, and is not a person who is particularly
susceptible to having his will overborne.  His attempts to elicit information about
the substance of the agents' investigation are not consistent with his
characterization of his state of mind during the interview as being very
intimidated.

Thus, considering the totality of the circumstances, it is more likely than not
that Mshihiri's statements were made voluntarily because they were not
extracted by threats, violence, or express or implied promises sufficient to
overbear his will and impair his capacity for self-determination.

## II.    MOTION TO SUPRESS EVIDENCE

### A.    The Warrants

As noted above, in his motion to suppress evidence obtained as a result of
a search and seizure, Mshihiri challenges the constitutionality of two search
warrants executed by law enforcement in the investigation of this case.  The first
is a warrant dated June 28, 2010, and authorizes the search of Mshihiri's
residence in Independence, Minnesota.  (Doc. No. 50, Ex. List, Gov't's Ex. 1

("Independence Warrant").)  The second is the warrant authorizing the search of

Mshihiri's person, his laptop, and any electronic storage devices in his

possession, which was executed on September 16, 2010, when Agent Olson and

Special Agent Shoup interviewed Mshihiri.  (Gov't's Ex. 2 ("Laptop Warrant").)

Both the Independence Warrant and the Laptop Warrant are supported by

Special Agent Shoup's affidavits.  Mshihiri's motion to suppress asserts that

these affidavits fail to sufficiently establish probable cause for the searches that

were authorized because neither informant who provided Special Agent Shoup

with information used in his affidavits was a reliable confidential informant.

Instead, he asserts that they were cooperating defendants admitting their own

guilt while hoping to provide assistance to the Government for which they might

obtain leniency.  (*See* Def.'s Mem. 6.)

Special Agent Shoup submitted the same affidavit in support of both

warrants.  He stated that he interviewed confidential reliable informant #1

("CRI #1") on several occasions.  (Independence Warrant, Aff. of Jim Shoup

("Shoup Aff.") ¶ 10.)  CRI #1 implicated himself in various frauds (*Id.*), and

Special Agent Shoup explained that CRI #1 implicated Mshihiri in fraudulent

conduct based on CRI #1's own interactions with Mshihiri.  (Shoup Aff. ¶ 13.)

Special Agent Shoup attests that he reviewed loan records and real-estate-

purchase records that indicate that Mshihiri was involved in fraudulent conduct,

including falsely enticing lenders to make loans that the lenders would not fund if

not for false documents submitted by Mshihiri and others to obtain the loans.

(Shoup Aff. ¶ 14.)  Special Agent Shoup's affidavit goes on to identify specific transactions believed to be fraudulent, describes how CRI #1 was able to provide details about fraudulent mortgages he obtained with Mshihiri, and how real estate records corroborated information CRI #1 provided to him.  (*See* Shoup Aff. ¶¶ 15–35.)  In his affidavit, Special Agent Shoup also asserts that another individual involved in the criminal network he was investigating, Oluwaleye Oluwatula, was identified by CRI #1 as someone who engages in fraudulent acts and assisted Mshhiri in committing fraud by helping supply stolen identities to Mshihiri.  (Shoup Aff. ¶ 29.)  Special Agent Shoup also attests to interviewing Mr. Oluwatula in which he admitted to Special Agent Shoup that he had worked with Mshihiri in obtaining fraudulent loans.  (Shoup Aff. ¶ 31.)  And finally, Special Agent Shoup discusses in his affidavit several suspected fraudulent transactions he reviewed in which Mshihiri was believed to have been involved based on his review of various records.  (Shoup Aff. ¶¶ 37–43.)

## B.    Reviewing a Warrant for Probable Cause

Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 238).

When determining whether probable cause exists, a court does not evaluate each piece of information independently, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004) ("In issuing a warrant, the judge makes a practical, common-sense decision whether, considering all the circumstances, a reasonable person would have reason to suspect evidence would be discovered." (quotations omitted)).

In reviewing the decision of the issuing court, this Court must ensure that the issuing court "'had a substantial basis for . . . conclud[ing] that probable cause existed.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

When information provided by a confidential informant is used to make the probable cause showing for the warrant, courts consider the informant's reliability

and the basis of his knowledge.  *United States v. Lucca*, 377 F.3d 927, 922 (8th Cir. 2004).  Information from a confidential informant is reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information.  *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

Here, Special Agent Shoup's affidavit sufficiently set forth probable cause to support the search of Mshihiri's Independence, Minnesota, residence and of his person, his laptop, and his electronic storage devices.  Special Agent Shoup sufficiently corroborated the information that CRI #1 provided him with other evidence.  And Special Agent Shoup's affidavit recounts sufficient detail that CRI #1 gave about Mshihiri's involvement in fraudulent transactions to be deemed sufficiently reliable.  Contrary to Mshihiri's arguments, Special Agent Shoup's affidavit sufficiently links the information obtained from CRI #1 and Mr. Oluwatula to specific fraudulent real estate transactions to provide probable cause to believe that Mshihiri was involved in criminal activity.  Accordingly, and in light of the great deference this Court must give to the court that issued the search warrants, the Court concludes that both the Independence Warrant and the Laptop Warrant are adequately supported by probable cause.

### C.   Good Faith Exception

Even if probable cause did not exist, there were two facially valid warrants and the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), must be considered.  "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable

cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted).

Mshihiri argues that the good-faith exception would not apply because (1) Special Agent Shoup's affidavits included so few indicia of probable cause that it was unreasonable for an officer to believe that probable cause existed, and (2) the warrant itself is facially deficient so that an officer could not reasonably presume it to be valid. (Def.'s Mem. 8.) This Court disagrees. The good-faith exception would clearly apply in this case if the warrants were not supported by sufficient probable cause (which they are). Even if probable cause were lacking, the information in Special Agent Shoup's affidavits links Mshihiri to the suspected criminal activity described and sets forth a reasonable basis for believing that evidence of that activity would be in Mshihiri's Independence, Minnesota, residence and in his laptop and electronic devices. Accordingly, the good-faith

exception to the exclusionary rule indicates that suppression of the evidence

seized pursuant to the two warrants at issue would be unjustified.

## RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.     Defendant's Motion to Suppress Statements, Admissions, and

Answers (Doc. No. 28), be **DENIED**; and

2.     Defendant's Motion to Suppress Evidence Obtained as a Result of

Search and Seizure (Doc. No. 29), be **DENIED**.


Date: December 20, 2013

                                        *s/Jeffrey J. Keyes*
                                        _____
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 3, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.


Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.